# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE, | * | CIVIL ACTION |
| AMERICAN EXPLORATION & | | |
| PRODUCTION COUNCIL, | * | NO: |
| INDEPENDENT PETROLEUM | | |
| ASSOCIATION OF AMERICA, | * | JUDGE |
| INTERNATIONAL ASSOCIATION OF | | |
| DRILLING CONTRACTORS, | * | MAG. JUDGE |
| INTERNATIONAL ASSOCIATION OF | | |
| GEOPHYSICAL CONTRACTORS, | * | |
| NATIONAL OCEAN INDUSTRIES | | |
| ASSOCIATION, MONTANA | * | |
| PETROLEUM ASSOCIATION, NORTH | | |
| DAKOTA PETROLEUM COUNCIL, | * | |
| PETROLEUM ALLIANCE | | |
| OF OKLAHOMA, SOUTHEAST OIL | * | |
| AND GAS ASSOCIATION, | | |
| UTAH PETROLEUM ASSOCIATION, | * | |
| AND WESTERN STATES PETROLEUM | | |
| ASSOCIATION | * | |
| | | |
| VERSUS | * | |
| | | |
| UNITED STATES DEPARTMENT OF | * | |
| THE INTERIOR; DEBRA HAALAND, | | |
| in her official capacity as Secretary of the | * | |
| Interior; LAURA DANIEL-DAVIS, | | |
| in her official capacity as Principal Deputy | * | |
| Assistant Secretary for Land and Minerals | | |
| Management; THE BUREAU OF LAND | * | |
| MANAGEMENT; NADA CULVER, | | |
| in her official capacity as Deputy Director | * | |
| of Policy and Programs, Bureau of Land | | |
| Management; THE BUREAU OF OCEAN | * | |
| ENERGY MANAGEMENT; and, | | |
| AMANDA LEFTON, in her official | * | |
| capacity as Director of the Bureau of | | |
| Ocean Energy Management | * | |

\*       \*       \*       \*       \*       \*       \*

## COMPLAINT

Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.     This case concerns whether the U.S. Department of the Interior ("DOI" or the "Department") and the Secretary of the Interior, Debra Haaland (the "Secretary"), acting through the Assistant Secretary, Land and Minerals Management ("ASLM"), the Bureau of Land Management ("BLM"), and the Bureau of Ocean Energy Management ("BOEM") (collectively, the "Defendants"), may institute an indefinite moratorium on all federal oil and gas lease sales onshore and on the Outer Continental Shelf ("OCS").

2.     Defendants halted federal oil and gas lease sales in direct response to Section 208 of President Biden's Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, issued on January 27, 2021. *See* 86 Fed. Reg. 7,619 (Feb. 1, 2021). Section 208 instructs the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices." 86 Fed. Reg. at 7,624-25. The Executive Order further directs that "[i]n conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties . . . or take other appropriate action, to account for corresponding climate costs." *Id.* at 7,625.

3.     Defendants attempted a *post hoc* repackaging of their recent federal oil and gas leasing actions as individual "cancellations" or "postponements" supposedly unrelated to each other or to Executive Order 14008. But since the promulgation of Executive Order 14008, Defendants have not held a single lease sale—a period stretching more than six months. On

knowledge and belief, the length of this period without any federal oil and gas lease sale is unprecedented.

4.     The uniform and systematic cancellation of all federal oil and gas lease sales since January 27, 2021, across multiple DOI agencies and their various regional or state offices, confirms that this is not a mere coincidence. Rather, contrary to their various statutory obligations and duties, Defendants have imposed a moratorium—express or *de facto*—on all new oil and gas leasing on federal lands and in federal waters in response to the President's directive.

5.     In establishing the leasing moratorium, Defendants abrogated applicable federal law that compels Defendants to regularly hold lease sales, engage the public in decisions involving federal oil and gas leasing, provide reasoned explanations for policy changes, and assess impacts to the human environment before they act.

6.     The moratorium must be vacated because it, *inter alia*:

   a.   violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706;

   b.   contravenes BLM's obligation to hold quarterly lease sales in each BLM state office under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq.*, and the Mineral Leasing Act for Acquired Lands ("MLAAL"), 30 U.S.C. § 351 *et seq.*;

   c.   is inconsistent with the Outer Continental Shelf Lands Act's ("OCSLA"), 43 U.S.C. § 1331 *et seq.,* Five-Year Leasing Program requirement and stated purpose to facilitate "expeditious and orderly development" of OCS oil and gas;

   d.   is an unlawful mineral withdrawal under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*;

    e.   does not conform to applicable Resource Management Plans ("RMPs"), which designate specific areas of public lands as available for oil and gas leasing; and

    f.   violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* including by failing to take the necessary hard look at the potential environmental impacts before its implementation.

## PARTIES[1]

7.    Plaintiff American Petroleum Institute ("API") is a national trade association that represents approximately 600 members involved in all aspects of the oil and natural gas industry, including the exploration and production of both onshore and offshore federal resources. Many API members bid on federal oil and gas leases during federal lease sales, for both onshore and offshore tracts.  Other API members include service and supply firms that rely on servicing federal oil and gas leases. The industry, including many API members, has paid more than $150 billion in royalty revenues to the federal treasury. The industry paid nearly $7 billion in lease bonus bid, lease rental, and royalty revenues to the federal treasury in FY 2020 alone. The U.S. oil and gas industry as a whole directly and indirectly supports more than 11 million U.S. jobs and makes up 8 percent of the U.S. economy.

8.    Plaintiff American Exploration & Production Council ("AXPC") is a national trade association representing 25 of the largest independent oil and natural gas exploration and production companies in the United States. AXPC companies are among leaders across the world in the cleanest and safest onshore production of oil and gas, while supporting millions of Americans in high-paying jobs and investing a wealth of resources in its communities. Dedicated

---

[1] Pursuant to Fed. R. Civ. P. 25, Plaintiff's claims against public office holders in their official capacity are lodged against the current officers.

to safety, science, and technological advancement, our members strive to deliver affordable, reliable energy to consumers while positively impacting the economy and the communities in which they live and operate.

9. Plaintiff Independent Petroleum Association of America ("IPAA") represents thousands of America's independent oil and natural gas producers. IPAA members are the primary producers of the nation's oil and natural gas and account for 83 percent of America's oil production and 90 percent of its natural gas output. Independent producers are a driving force in our economy and support roughly 4.5 million jobs in the United States. IPAA member companies are innovative leaders and broke the code to usher in the shale oil and natural gas revolution in the United States.

10. Plaintiff International Association of Drilling Contractors ("IADC"), established in 1940 and based in Houston, Texas, operates on six continents, and its members are acknowledged leaders in onshore and offshore drilling operations around the world. IADC is globally recognized for its work in providing: accreditation programs for a competent global upstream energy workforce; technical publications serving industry and regulatory authorities; international conferences; and, collaborative government-industry advocacy work. IADC's collective efforts contribute to operational proficiencies that underpin the world's upstream energy industry while sustaining high standards of safety, environmental stewardship, and operational efficiency.

11. Plaintiff International Association of Geophysical Contractors ("IAGC") is a private non-profit trade association that represents approximately 50 members from all segments of the geophysical and exploration industry. IAGC engages governments and stakeholders worldwide on issues central to geophysical operations and exploration access. IAGC's mission is to optimize the business and regulatory climate for its members, enhance public understanding of the geophysical industry, and ensure a strong, viable geophysical and exploration industry. IAGC

has existed for 50 years and is the only global trade organization solely dedicated to the geophysical and exploration industry.  IAGC works vigorously on behalf of its members on issues of common interest and industry-wide topics and initiatives that support the continued vitality of the geophysical and exploration industry. Through advocacy, outreach, and development of industry guidelines, IAGC focuses on issues that affect the core businesses of the geophysical and exploration industry, including issues involving the ability of its members to conduct exploratory activities on the OCS and onshore federal lands. For example, IAGC (i) engages government and regulatory entities with credible scientific, technical, and legal analyses to both protect the environment and develop essential energy supplies; (ii) educates its members on regulatory initiatives and policies affecting the geophysical industry; (iii) organizes consistent industry positions on emerging policy and regulatory issues; (iv) participates in regulatory proceedings affecting its members and the geophysical and exploration industry; and (v) when necessary, engages in litigation on matters that affect its members and the geophysical and exploration industry.

12.     Plaintiff National Ocean Industries Association ("NOIA") represents and advances a dynamic and growing offshore energy industry, providing solutions that support communities and protect its workers, the public, and the environment. For nearly 50 years, NOIA has been committed to ensuring a strong, viable U.S. offshore energy industry capable of meeting the energy needs of our nation in an efficient and environmentally responsible manner. NOIA member companies are engaged in traditional oil and natural gas exploration and production, as well as offshore wind energy development. Further, NOIA's members include energy developers and, just as importantly, the businesses—large and small—who do the work of building, supplying, and servicing these projects.

13.     Plaintiff Montana Petroleum Association ("MPA") is a Montana-based trade association representing over 150 member companies involved in all aspects of the oil and natural gas industry. MPA's members include producers, refiners, suppliers, pipeline operators, and transporters, as well as service and supply companies that support all segments of the industry and employ a great number of people in Montana. MPA works with elected officials, business groups, regulatory boards, and agencies to promote policies which incentivize revenue generating resource production and opposes rules and regulations which hamper future oil and gas opportunities.

14.     Plaintiff North Dakota Petroleum Council ("NDPC") has been the primary voice of the oil and gas industry in North Dakota since 1952.  NDPC represents more than 525 companies who are involved in all aspects of the oil and gas industry including oil and gas production, refining, pipeline, mineral leasing, consulting, legal work, and oil field service activities in North Dakota, South Dakota, and the Rocky Mountain region.

15.     Plaintiff Petroleum Alliance of Oklahoma ("Petroleum Alliance") is the oil and natural gas trade association created by the merger of the Oklahoma Independent Petroleum Association and the Oklahoma Oil & Gas Association. The Petroleum Alliance is the only trade association in Oklahoma that represents all segments of the oil and gas industry in Oklahoma, including independent oil and natural gas producers, drilling contractors, midstream companies, service and supply companies, refineries, contractors, individuals, and mineral owners. This action is important to Petroleum Alliance members because its resolution will likely have a resounding impact on its 1,300 members and the oil and gas industry in Oklahoma as a whole.

16.     Plaintiff Southeast Oil and Gas Association Association, a 501(c)(6) organization, serves as the oil and gas trade association for Mississippi and Alabama, seeking productive public policy outcomes towards the furtherance and success of the oil and gas industry.

17.     Plaintiff Utah Petroleum Association ("UPA") is a Utah-based, statewide petroleum trade association representing companies involved in all aspects of Utah's oil and gas industry. UPA exists to serve its member companies and advance the responsible development of Utah's natural resources and manufacture of fuels that drive Utah's economy. Its members range from independent producers to major oil and natural gas companies widely recognized as industry leaders responsible for driving technology advancement resulting in environmental and efficiency gains.

18.     Plaintiff Western States Petroleum Association ("WSPA") is a non-profit, mutual benefit trade association that represents companies that account for the bulk of petroleum exploration, production, refining, transportation and marketing in the five western states of Arizona, California, Nevada, Oregon, and Washington. Founded in 1907, WSPA is dedicated to ensuring that Americans continue to have reliable access to petroleum and petroleum products through policies that are socially, economically, and environmentally responsible.

19.     Defendant DOI is a federal agency of the United States within the scope of 5 U.S.C. § 701(b)(1) and is responsible for implementing the federal oil and gas leasing program.

20.     Defendant BLM is a federal agency of the United States within the scope of 5 U.S.C. § 701(b)(1) and has been delegated the responsibility for implementing the onshore federal oil and gas leasing program.

21.     Defendant BOEM is a federal agency of the United States within the scope of 5 U.S.C. § 701(b)(1) and has been delegated the responsibility for implementing the federal oil and gas leasing program on the OCS.

22.     Defendant Debra Haaland is the Secretary of the Interior. She is sued in her official capacity.

23.     Defendant Laura Daniel-Davis is the Principal Deputy Assistant Secretary for Land and Minerals Management, exercising the authority of the Assistant Secretary for Land and Minerals Management. She is sued in her official capacity.

24.     Defendant Nada Culver is the BLM Deputy Director of Policy and Programs, exercising the authority of the BLM Director. She is sued in her official capacity.

25.     Defendant Amanda Lefton is the BOEM Director. She is sued in her official capacity.

## JURISDICTION AND VENUE

26.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(2) (United States defendant) because agencies of the United States government are named defendants, and 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the APA.

27.     This Court is authorized to award the requested relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201 & 2202.

28.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because Defendants are federal agencies of the United States or officers sued in their official capacities or under color of legal authority; a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district; many of Plaintiffs' members are located in this district; and no real property is involved in this action.

## LEGAL BACKGROUND

### A.     Mineral Leasing Act

29.     The MLA establishes authority for the Secretary to create competitive and noncompetitive leasing systems for the development of mineral resources on federal public domain lands.

30.    The MLAAL provides authority for the Secretary to lease oil and gas on lands acquired by the United States generally under the same conditions as in the MLA.  For brevity, references hereinafter to the MLA include the MLAAL.

31.    Congress, over time, circumscribed the Secretary's leasing discretion under the MLA, and in 1987 passed the Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA").

32.    FOOGLRA added a mandatory duty for the Secretary to lease eligible federal lands for oil and gas development, requiring that "[l]ease sales *shall* be held for each State where eligible lands are available *at least quarterly* and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b) (emphasis added). BLM subsequently adopted regulations and guidance further codifying the obligation to hold quarterly lease sales. *See* 43 C.F.R. § 3120.1-2(a).

33.    Lands not excluded from leasing by a statutory or regulatory prohibition are generally deemed eligible for oil and gas leasing.

34.    Eligible lands not excluded from oil and gas development under an RMP are generally deemed available for oil and gas leasing.

35.    Regulations promulgated under the MLA require that lands available for oil and gas leasing "shall be offered for competitive bidding," otherwise known as a lease sale. 43 C.F.R. § 3120.1-1. Lands can be offered for noncompetitive leasing only after they have been offered competitively through a lease sale without attracting a bid. *Id.* § 3110.1.

36.    A competitive lease sale for onshore federal resources begins with the identification of potential lease tracts through the nomination process. *See* 43 C.F.R. §§ 3120.3. BLM issues a list of lands available for nomination, and then interested parties must nominate particular tracts by submitting a form approved by the BLM Director. *Id.* § 3120.3-2.

37.     BLM conducts an environmental review pursuant to NEPA on the lands to be included and then issues a Notice of Competitive Lease Sale, describing the date, time, and place of the lease sale, which must be posted at least 45 days prior to the sale in the relevant BLM State Office. *Id.* §§ 3120.4-1, 3120.4-2.

38.     Once BLM posts the Notice of Competitive Lease Sale, it provides a 30-day protest period.

39.     BLM then publishes a final list of available parcels and holds a lease sale at the appointed date and time. Lease tracts are offered by oral or internet bidding. Known as a "bonus bid," the bids are an amount per acre that the potential lessee offers to pay to receive the lease in addition to other payments required under the terms of the lease agreement (e.g., annual rental charges and royalties on any oil or gas produced). The winning bid is the highest bid submitted by a qualified bidder that equals or exceeds the minimum acceptable bid.

40.     Since 1987, quarterly federal oil and gas lease sales have been held on eligible available lands under this statutory framework.

41.     Defendants have summarily jettisoned this longstanding framework and instead have indefinitely banned any scheduled lease sales. Following Executive Order 14008 on January 27, 2021, no lease sales have occurred for the first and second quarters of 2021 and for the third quarter of 2021 to date.

**B.     Federal Land Policy and Management Act**

42.     The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, is a planning statute that governs the Secretary's and BLM's administration of onshore public lands.

43.      Among other requirements, FLPMA requires the Secretary to "develop, maintain, and, when appropriate, revise land use plans which provide . . . for the use of public lands." 43

U.S.C. § 1712(a). These plans, known as RMPs, are prepared by BLM, the agency that the Secretary has designated to comply with FLPMA's requirements. 43 C.F.R. § 1610.1(b).

44.      In an RMP, BLM can, following public input, designate sections of public lands as open or closed for certain uses, including oil and gas leasing, and may identify stipulations that will attach to such activities.

45.      FLPMA mandates specific procedures prior to the Secretary closing an area to a particular use. The statute requires that the Secretary notify both chambers of Congress of a decision in an RMP "that excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more." 43 U.S.C. § 1712(e)(1). A "principal or major use" is defined to include oil and gas leasing and development. *See id.* § 1702(l).

46.      Once finalized, the Secretary is prohibited from taking actions on public lands inconsistent with the provisions of the applicable RMP. *See* 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed by [his or her predecessors] . . . ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions . . . shall conform to the approved plan.").

47.      The Secretary may amend an RMP only through a formal land use plan amendment process that includes public participation. *See* 43 U.S.C. § 1712; *see also* 43 C.F.R. §§ 1610.1-1610.8.

48.      Promulgation of RMPs and land use plan amendments are major federal actions with potential environmental impacts that must also be assessed under NEPA.

49.      FLPMA also attaches required rigid procedures to decisions to formally withdraw lands from future uses, including oil and gas leasing. *See* 43 U.S.C. § 1714. A "withdrawal" under

FLPMA means "withholding an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." *Id.* § 1702(j). This definition includes withholding an area from mineral leasing.

50.     For any withdrawal of public lands, FLPMA requires that the Secretary publish a notice in the Federal Register, provide an opportunity for a public hearing and comment, and obtain consent of other federal, state, or local departments or agencies affected by the withdrawal. *Id.* §§ 1714(b), (h), (i).

51.     For withdrawals aggregating 5,000 acres or more, FLPMA further mandates that the Secretary provide a detailed notification to Congress that includes, among other things, an explanation of why the lands are to be withdrawn, an inventory of the current natural resource uses, and a statement of the expected length of the withdrawal. *Id.* § 1714(c).

52.     On knowledge or belief, no previous Secretary has indefinitely closed or withdrawn all public lands from federal oil and gas leasing.

### C.     Outer Continental Shelf Lands Act

53.     Enacted more than 70 years ago, OCSLA declares that the OCS is "a vital national resource reserve held by the Federal Government for the public," and that the Secretary of the Interior should make the OCS "available for *expeditious and orderly development*, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3) (emphasis added). Indeed, Congress amended OCSLA to require such "expeditious and orderly development" after making an express finding inserted into the statute regarding "a variety of technological, economic, environmental, administrative, and legal problems which tend[ed] to retard the development of the oil and natural gas reserves." *Id.* § 1801(8).

54.     OCSLA provides the Secretary with a multi-stage, multi-year planning process to manage development of the OCS. *See* 43 U.S.C. § 1344. The first stage mandates that the Secretary issue and maintain "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which [he or she] determines will best meet national energy needs for the five-year period following its approval or reapproval." *Id.* § 1344(a). The product is commonly known as the "Five-Year Leasing Program."

55.      The Five-Year Leasing Program requires multiple rounds of comment solicitation from federal agencies, governors of affected states, and the public. *See generally* 30 C.F.R. part 556, subpart B.

56.     The process begins with the development of proposed leasing maps of OCS areas and the publication of a notice in the Federal Register inviting comment from interested parties, including governors of affected states. 30 C.F.R. §§ 556.202(a) & (b). BOEM must further send a letter to affected governors asking them to identify relevant laws and policies that should be considered in the planning process. *Id.* § 556.202(c).

57.     After considering comments, BOEM must prepare a draft Five-Year Leasing Program, which is open for additional comments and must be published in the Federal Register. 30 C.F.R. §§ 556.203(a)-(c).

58.     Concurrently with the notice and comment process, BOEM must also conduct an environmental analysis under NEPA on the draft Five-Year Leasing Program. This analysis is subject to its own notice and comment requirements.

59.     Before approval of the final Five-Year Leasing Program, BOEM must also submit the proposed final Program to Congress and the President. 30 C.F.R. § 556.205.

60.     As BOEM has recognized, the Five-Year Leasing Program preparation process includes three separate comment periods, two separate draft proposals, a final draft proposal, final secretarial approval, and development of an Environmental Impact Statement ("EIS") under NEPA. This statutorily mandated process usually takes about two and a half years to complete.

61.     OCSLA mandates that all lease sales must be conducted in accordance with the Five-Year Leasing Program. 43 U.S.C. § 1344(d)(3) ("[N]o lease shall be issued unless it is for an area included in the approved leasing program.").

62.     OCSLA further mandates that, following preparation of a Five-Year Leasing Program, BOEM must maintain that program.  That is, its mere adoption without subsequent implementation is insufficient to comply with OCSLA.

63.     Since 1978, when Congress amended OCSLA to include the five-year planning requirement, BOEM (and its predecessor agency the Minerals Management Service) have promulgated nine distinct Five-Year Leasing Programs. Collectively, a leasing program has been in effect continuously since 1980.

64.     The current Five-Year Leasing Program is scheduled to expire on July 1, 2022. BOEM published a draft Five-Year Leasing Program for the period from 2019 to 2024, seeking to succeed the existing program. However, that program was not finalized. Since January 2021, Defendants have not completed the lease sales called for under the existing Five-Year Leasing Program, nor have they engaged in the statutory or regulatory steps required to develop a new program. Without a program in place, no lease sales can occur on the OCS after July 1, 2022. *See* 43 U.S.C. § 1344(d)(3).

D.      National Environmental Policy Act

65.      Under NEPA, federal agencies must conduct an environmental impact analysis *before* undertaking "major federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C).

66.      A "major federal action" means "an activity or decision subject to Federal control and responsibility" subject to certain conditions and limitations. 40 C.F.R. § 1508.1(q). Major federal actions generally include, *inter alia*, "adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." *Id.* § 1508.1(q)(3)(iii).

67.      The quality of the "human environment" means "comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). Effects or impacts to the human environment include ecological, aesthetic, historic, cultural, economic, social, or health effects. *Id.* § 1508.1(g)(1). These effects also include those resulting from actions that may have "both beneficial and detrimental effects," even if on balance the agency believes that the effect is "beneficial." *Id.*

68.      If the action significantly affects the quality of the human environment, the agency must prepare an EIS assessing the anticipated impacts of the proposed action and a reasonable range of alternatives on all aspects of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. part 1502.

69.      The agency must engage with the public in this process, including through upfront scoping and publishing the draft EIS for public comment, and DOI must request comment from state agencies, local governments, and other interested persons. 40 C.F.R. §§ 1502.9, 1503.1, 1503.4; 43 C.F.R. § 46.435(b).

16

## FACTUAL BACKGROUND

70.     President Biden issued Executive Order 14008 on January 27, 2021, directing in Section 208 that the Secretary of the Interior, consistent with applicable law, "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices." 86 Fed. Reg. 7,619 (Feb. 1, 2021). Executive Order 14008 further directs that "[i]n conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties . . . or take other appropriate action, to account for corresponding climate costs." *Id.* at 7,625.

71.     In response to Executive Order 14008, Defendants have taken a series of final agency actions to halt all federal oil and gas lease sales both onshore and on the OCS. Defendants have expressly or impliedly linked these actions to Executive Order 14008.

72.     Defendants adopted a moratorium by halting the following previously scheduled BLM and BOEM oil and gas lease sales:

a.      On January 27, 2021, the Nevada BLM State Office issued an errata sheet postponing the federal oil and gas lease sale scheduled for March 9, 2021. The agency had posted a Notice of Competitive Oil and Gas Lease Sale announcing the sale for 17 parcels only three weeks earlier on January 8, 2021. No rationale was provided for the postponement and no announcement has been made as to when the sale might be rescheduled.

b.      On February 12, 2021, the Wyoming BLM State Office updated the posting for the March 2021 federal oil and gas lease sale to note that the Wyoming lease sale was "postponed to confirm the adequacy of the underlying environmental analysis." No further

reasoning was provided for the postponement and no information has been made public on rescheduling.

      c.     On February 12, 2021, the Montana/Dakotas BLM State Office updated a posting for its March 23, 2021, federal oil and gas lease sale to indicate that the scheduled sale was "paused." The status remains "paused" as of the date of this filing and no further information has been posted on when the sale might be rescheduled.

      d.     On February 12, 2021, the BLM Utah State Office updated the project status for a federal oil and gas lease sale scheduled for March 30, 2021, to note that it was "cancelled." The Utah State Office has not provided any further updates on this lease sale.

      e.     On February 12, 2021, the BLM Colorado State Office updated the project website for the federal oil and gas lease sale scheduled for March 25, 2021, stating the sale "has been postponed." The Colorado State Office has not announced if the sale might be rescheduled.

      f.     On February 12, 2021, the BLM Eastern States Office issued an errata sheet postponing the federal oil and gas lease sale scheduled for March 21, 2021 until June 17, 2021. The Eastern States Office subsequently announced that BLM is "exercising its discretion to not hold lease sales in the second quarter of Calendar Year 2021."

      g.     On February 18, 2021, BOEM rescinded the record of decision for the March 17, 2021 Gulf of Mexico OCS oil and gas lease Sale 257 "to comply with Executive Order 14008." *See* 86 Fed. Reg. 10,132, 10,132 (Feb. 18, 2021).

      h.     On February 23, 2021, BOEM rescinded the public review period for the draft EIS for the Cook Inlet OCS Oil and Gas Lease Sale 258 "in response to Executive

Order 14008." *See* 86 Fed. Reg. 10,994 (Feb. 23, 2021). Without an EIS, the lease sale cannot move forward as scheduled.

       i.     On March 4, 2021, BLM's Oklahoma Field Office updated the posting for its April 2021 sale to change the status of the upcoming April 2021 lease sale to "paused."

       j.     On March 4, 2021, BLM's Pecos, New Mexico District Office updated the posting for its April 2021 sale to change the status of the upcoming April 14, 2021 lease sale to "paused."

73.    On April 21, 2021, the BLM issued a public statement declaring that as a result of the review required by Executive Order 14008, "the Bureau of Land Management is exercising its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021." The statement makes no mention of whether BLM expects to hold lease sales in the third or fourth quarters of 2021, or when it plans to hold a federal oil and gas lease sale again.

74.    That Defendants chose not to adopt the moratorium through a rulemaking or by formally mandating a policy shift through a Secretarial order does not alter the reality that Defendants have implemented the moratorium. The obvious conclusion to be drawn from the systematic suspension of every federal oil and gas lease sale scheduled for the first and second quarters of 2021 by both BLM and BOEM, and no indication of imminent leasing, is that there has been a directive from the highest levels of the Department to halt all such lease sales.

75.    Defendants may not shield their actions from judicial review simply because they declined to make their internal directive to cancel federal oil and gas lease sales public. Plaintiffs challenge the Defendants' moratorium cumulatively evidenced by their pronouncements and various final agency actions indefinitely halting federal oil and gas lease sales.

76.     Regardless of the label Defendants ascribe to them, Defendants' collective actions to halt federal oil and gas lease sales are subject to review in this Court.

77.     Plaintiffs' members are significantly harmed by DOI's decision to indefinitely suspend further federal oil and gas lease sales. Among other things, many of Plaintiffs' members have invested millions of dollars in acquiring and exploring federal oil and gas leases in reliance that adjacent tracts needed to complete the development of an oil and gas prospect would be available for lease in scheduled or statutorily mandated lease sales. If operators cannot obtain access to these additional leases necessary to complete development, their substantial investment is substantially diminished or may be lost entirely. Especially on the deepwater OCS, prompt leasing is necessary to sufficiently plan for more than a decade of exploration and development activities within deadlines specified in the law and active leases.

## FIRST CAUSE OF ACTION

**(Defendants' Departure from Previous Policy without Sufficient Explanation and in Excess of Statutory Authority Violates the APA, 5 U.S.C. § 706)**

78.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–77 as if fully set forth herein.

79.     Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

80.     When a federal agency shifts its policy or reverses prior decisions, it must provide a reasoned explanation for the change, or the action will be deemed arbitrary and capricious. This is particularly true when its prior policy has engendered serious reliance interests that must be taken into account.

81.     Federal courts have also required agencies to provide a more detailed explanation where its new policy rests upon factual findings that contradict those which underlay its prior policy.

82.     Prior to establishing the leasing moratorium, and indeed for decades, Defendants have engaged in quarterly oil and gas lease sales for available onshore federal lands, and scheduled lease sales pursuant to a promulgated Five-Year Leasing Program offshore in federal waters.

83.     Plaintiffs' members have operated under these longstanding agency practices and rely upon the availability of new federal leases for oil and gas development to sustain their businesses.

84.     Defendants have suddenly and comprehensively upended the status quo by indefinitely postponing or cancelling all federal oil and gas lease sales without providing any rationale. Indeed, Defendants are not even willing to publicly admit what they are doing, much less provide an explanation sufficient to justify the change.

85.     Defendants' radical departure from prior policy in implementing the moratorium without a reasoned explanation was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and in excess of their authority.

## SECOND CAUSE OF ACTION

**(Defendants' Actions Lack Record Support in Violation of the APA, 5 U.S.C. § 706)**

86.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–85 as if fully set forth herein.

87.     When an agency has not stated any reasons to support a decision, its decision is inherently arbitrary and capricious.

88.    The agency must be able to provide the essential facts upon which the administrative decision was based and explain what justifies the determination with actual evidence beyond conclusory statements.

89.    In implementing their moratorium, Defendants have not even issued any statement recognizing their actions. Rather, Defendants have sought to deny the very fact of its existence. Defendants' actions lack record support and fail to consider all relevant factors.

90.    The moratorium's adoption mere days after the new administration took office precludes any meaningful administrative record or environmental review to support the moratorium.

91.    Defendants also ignore relevant evidence. For example, as part of the issuance of the current Five-Year Leasing Program during the Obama administration, BOEM developed and in 2017 issued a Programmatic EIS which concluded that greenhouse gas emissions relating to the lease sales in the proposed leasing program would be *lower* than a no-action alternative (i.e., no lease sales) because of the effect of substituting oil and gas production and imports from countries with less robust environmental regulation surrounding oil and gas production. *See, e.g.*, 2017-2022 OCS Oil and Gas Leasing Program Final Programmatic EIS at 4-8. Accordingly, the no-action alternative mirroring the moratorium poses worse effects for the global environment than continuing domestic lease sales as scheduled. Defendants cited no contrary evidence in imposing the moratorium preventing all lease sales under the approved Five-Year Leasing Program.

92.    Defendants fail to reconcile the moratorium with the 2017 Programmatic Environmental Impact Statement's conclusions that greenhouse gas emissions would increase if lease sales were not held.

93.     Defendants' decision to impose a moratorium on federal oil and gas lease sales without any record and in conflict with its own prior factual determinations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### THIRD CAUSE OF ACTION

**(Halting All Onshore Federal Oil and Gas Lease Sales Violates the MLA, 30 U.S.C. § 226, and the APA, 5 U.S.C. § 706)**

94.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–93 as if fully set forth herein.

95.     Also under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action… found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

96.     The APA additionally provides that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

97.     In 1987, Congress amended the MLA through FOOGLRA to require that "[l]ease sales *shall be held* for each State where eligible lands are available *at least quarterly* and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A) (emphasis added).

98.     BLM has issued a regulation implementing this directive. *See* 43 C.F.R. § 3120.1-2(a) ("Each proper BLM State office shall hold sales at least quarterly if lands are available for competitive leasing.").

99.     Defendants have halted all onshore federal oil and gas lease sales for the first and second quarters of 2021. Defendants also have not announced the resumption of leasing.

100.     Defendants have not declared all onshore federal lands ineligible or unavailable. Nor have Defendants undertaken the prerequisite steps for such drastic action.

101.     Defendants do not have the authority under the MLA to cease conducting all lease sales.

102.     Defendants' failure to hold quarterly lease sales on eligible available onshore lands violates the MLA's express statutory command and therefore is arbitrary and capricious, is in excess of Defendants' statutory authority, and unlawfully withholds or unreasonably delays required lease sales.

## FOURTH CAUSE OF ACTION

**(Halting All Onshore Federal Oil and Gas Lease Sales Constitutes an Improper Closure or Withdrawal under FLPMA, 43 U.S.C. §§ 1712, 1714, 1732, and the APA, 5 U.S.C. § 706)**

103.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–102 as if fully set forth herein.

104.     The APA also provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

105.     FLPMA provides specific procedural steps with which Defendants must comply prior to closing or withdrawing public lands from future oil and gas leasing.

106.     To close an area greater than 100,000 acres to oil and gas development in an RMP, the Defendants must notify both chambers of Congress. *See* 43 U.S.C. § 1712(e)(2).

107.     FLPMA also provides a mechanism to withdraw areas from a particular use, including oil and gas development. To do so, the statute requires Defendants to publish a notice in the Federal Register. *See* 43 U.S.C. § 1714(b). For withdrawals aggregating five thousand acres or more, additional procedural requirements apply, including that the Secretary must notify both chambers of Congress and provide detailed information to Congress regarding the withdrawals. *See id.* § 1714(c).

108.    If an area is not closed to oil and gas development in an RMP or otherwise withdrawn, the Secretary cannot exclude it from such use. *See id.* § 1732(a).

109.    Defendants have not provided the relevant notice required to close or withdraw public lands from oil and gas leasing as required under FLPMA.

110.    The moratorium on onshore federal oil and gas lease sales excludes such lands from use in oil and gas development, and therefore constitutes a closure or a withdrawal within the meaning of FLPMA without following the statutory requirements for effecting such a closure or withdrawal.

111.    In effectuating the moratorium, Defendants have acted arbitrarily and capriciously, exceeded their statutory authority, and failed to observe necessary procedures under FLPMA.

## FIFTH CAUSE OF ACTION

### (Halting All OCS Federal Oil and Gas Lease Sales Violates OCSLA, 43 U.S.C. § 1331 *et seq.*, and the APA, 5 U.S.C. § 706)

112.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–111 as if fully set forth herein.

113.    The statutory purpose behind OCSLA is to ensure the Secretary makes the OCS "available for *expeditious and orderly development*, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3) (emphasis added).

114.    Defendants have rescinded the record of decision for Gulf of Mexico Oil and Gas Lease Sale 257. Defendants also have cancelled the comment period on the draft EIS for Cook Inlet OCS Oil and Gas Lease Sale 258. Defendants have provided no indication if or when the record of decision or draft EIS will be revised and reissued. Both lease sales were scheduled to take place in 2021, but neither can take place as a result of Defendants' moratorium.

115.    Defendants' moratorium on all oil and gas leasing on the OCS countermands OCSLA's purpose and requirements to plan for and hold lease sales.

116.    OSCLA does not provide the Secretary statutory authority to indeterminately cease all oil and gas leasing on the OCS.

117.    Defendants' failure to hold OCS lease sales therefore is arbitrary and capricious, is in excess of Defendants' statutory authority, and unlawfully withholds or unreasonably delays required lease sales.

## SIXTH CAUSE OF ACTION

**(Preclusion of Timely Issuance of a Five-Year Leasing Program Violates OCSLA, 43 U.S.C. § 1331 *et seq.*, and the APA, 5 U.S.C. § 706)**

118.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–117 as if fully set forth herein.

119.    The current Five-Year Leasing Program is scheduled to expire on July 1, 2022.

120.    Defendants cannot complete all requisite steps to timely propose and adopt a new Five-Year Leasing Program before the current program expires.

121.    The moratorium indefinitely precluding any OCS lease sales further ensures Defendants will not timely adopt a new Five-Year Leasing Program.

122.    Absent an approved Five-Year Leasing Program, Defendants cannot hold lease sales. *See* 43 U.S.C. § 1344(d)(3).

123.    Defendants have therefore both indefinitely postponed scheduled OCS lease sales, and through inaction ensured no lease sales can take place after July 1, 2022.

124.    OSCLA does not provide the Secretary the statutory authority to indeterminately cease oil and gas leasing on the OCS.

125.     Defendants' failure to timely issue a new Five-Year Leasing Program therefore is arbitrary and capricious, is in excess of Defendants' statutory authority, and unlawfully withholds or unreasonably delays that required action.

### SEVENTH CAUSE OF ACTION

**(The Moratorium Violates NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. § 706)**

126.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–125 as if fully set forth herein.

127.     NEPA requires federal agencies to prepare an EIS before undertaking "major federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C).

128.     Implementation of a nationwide federal oil and gas leasing moratorium is a major federal action "significantly affecting the quality of the human environment," and NEPA therefore requires the preparation of an EIS. *See* 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.1(q)(3).

129.     Defendants undertook no NEPA review, in an EIS or other NEPA document, prior to adopting the leasing moratorium.

130.     To the extent Defendants claim that the moratorium is to facilitate an environmental review, that assertion does not negate or fulfill NEPA's requirement to assess the impact of indefinitely suspending lease sales *before* engaging in such actions.

131.     Defendants' decision to suspend all federal oil and gas leasing without conducting an environmental review violates NEPA and denies the public its right to participate in informed agency decision-making.

## EIGHTH CAUSE OF ACTION

### (The Moratorium Violates the Procedural Requirements for Substantive Rulemaking under the APA, 5 U.S.C. §§ 553, 706)

132.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–131 as if fully set forth herein.

133.    Implementation of a nationwide federal oil and gas leasing moratorium is a rule because it is an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. *See* 5 U.S.C. § 551(4).

134.    Implementation of a nationwide federal oil and gas leasing moratorium is a substantive, or legislative, rule because it mandates requirements that were not in place before, supplements existing law, and does not simply reiterate existing duties.

135.    Implementation of a nationwide federal oil and gas leasing moratorium is a substantive rule because it also contravenes or amends existing regulations for leasing oil and gas onshore and on the OCS. *See* 43 C.F.R. § 3120.1-2(a); 30 C.F.R. part 556, subpart B.

136.    Defendants failed to provide a notice of rulemaking in the Federal Register, and allow comment by interested parties, as required for a substantive rule. *See* 5 U.S.C. § 553(b)-(c).

137.    The moratorium does not meet any exception to notice and comment rulemaking.

138.    These failures violate the APA and deny the public its right to participate in informed agency decision-making.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

  a. Declare that Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

b.  Declare that Defendants' actions are beyond their statutory authority under the

MLA, MLAAL, and OCSLA;

c.  Declare that Defendants failed to observe required procedure under FLPMA;

d.  Declare that Defendants failed to comply with NEPA;

e.  Compel Defendants to proceed with lease sales under the MLA, MLAAL, and

OCSLA, to the same extent as prior to Executive Order 14008;

f.  Compel Defendants to promptly adopt a new Five-Year Leasing Program for

OCS leasing;

g.  Award Plaintiffs their costs and attorneys' fees; and

h.  Grant such other legal or equitable relief as the Court may deem just and proper.

Dated:  August 16, 2021

Respectfully submitted,

*/s/ Kenneth H. Laborde*
KENNETH H. LABORDE (NO. 8067)
VICTORIA E. EMMERLING (NO. 33117)
GIEGER, LABORDE & LAPEROUSE
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone:     (504) 561-0400
Facsimile:      (504) 561-1011
Email:  klaborde@glllaw.com
              temmerling@glllaw.com

-AND-

PETER J. SCHAUMBERG
JAMES M. AUSLANDER
BEVERIDGE & DIAMOND PC
1900 N St. NW Suite 100
Washington, DC 20036
Phone: (202)789-6000 Fax: (202)789-6000
Email: pschaumberg@bdlaw.com
              jauslander@bdlaw.com

*Attorneys for Plaintiffs American Petroleum Institute, American Exploration & Production Council, Independent Petroleum Association of America, International Association of Drilling Contractors, International Association of Geophysical Contractors, National Ocean Industries Association, Montana Petroleum Association, North Dakota Petroleum Council, Petroleum Alliance of Oklahoma, Southeast Oil and Gas Association, Utah Petroleum Association, and Western States Petroleum Association*